## Appeal of HAAS BROS.

Docket No. 1675.   Submitted July 6, 1925.   Decided November 24, 1925.

> At the close of the year taxpayer had outstanding contracts to purchase merchandise, which was undelivered. Upon its books it set up as losses the difference between the contract price and the market price and deducted such alleged losses upon its income-tax returns. Upon the evidence, *held*, that title to such goods had not passed at the close of the year, that such goods could not be included in inventory, and that no deduction could be taken.

*I. I. Brown* and *Geo. E. Stokes, Esqs.*, for the taxpayer.
*Ward Loveless, Esq.*, for the Commissioner

Before GRAUPNER, TRAMMELL, and PHILLIPS.

This is an appeal from the determination of a deficiency in income and profits taxes for 1919 in the amount of $6,315.88, and for 1920 in the amount of $8,745.11, and involves the right of the taxpayer to include certain undelivered goods in its closing inventories for such years.

### FINDINGS OF FACT.

The taxpayer is a corporation organized under the laws of the State of California, with its principal office in San Francisco, and during the years involved in this appeal was engaged in business as a wholesale dealer in groceries and like merchandise.

During the month of November, 1919, taxpayer entered into four contracts for the purchase of Robusta coffee at specified prices. The contracts were upon the printed forms of the broker and the terms and conditions were substantially the same in each, except as to the date, the price, the name of the seller, and the amount of coffee to be delivered, and were in form as follows:

BROKER'S CONTRACT.

C. E. BICKFORD & Co.
104–106 California Street.

   Sold to Arrive to Messrs. Haas Bros.

   For Account of Messrs. W. R. Grace & Co.

   Terms: Cash less 2%, Fifteen days from date of tender of delivery at
      San Francisco, Calif.

Contract No. X 943.                    San Francisco, Cal., Nov. 7, 1919.

About One thousand (1,000) Bags of Robusta Coffee at twenty and five eighths
   (20⅝) Cents Gold per lb. San Francisco.

Coffee to be shipped from source by steamer or steamers to San Francisco,
   during November/December 1919.

Should the Government impose a duty, coffee is to be taken by Buyer in bond.
   Quality to be based on:

Coffee is described Washed Robusta, guaranteed sweet.

Sale to be absolute and coffee is to be taken by Buyer if average grading
within one half (½¢) cent per pound of the sample or description sold by at
the graded allowance, and if better than said sample or description, no premium
is to be paid.

If the average quality of coffee tendered for delivery on this Sale exceeds
one half (½¢) cent per pound below the type or sample or description sold
by, then the Buyer has the option of taking the coffee tendered at the graded
difference, or refusing to accept the shipment, but in the latter case the Seller
has the option of delivering "spot" coffee in accordance with the contract,
grade or description in its place.

Seller may select and/or grade and make any arrivals of coffee uniform by
mixing if deemed necessary for proper delivery. Coffee tendered shall be
considered accepted unless claims are filed in writing within ten (10) days
after tender of delivery.

If contract price is based on some special feature in description, type or
sample, and so described, Buyer can not be compelled to accept delivery of
coffee of an entirely different character, even with an allowance, but in this
event Seller can not be compelled to deliver other coffee where good faith on
shipper's part is evidenced by quality of coffee tendered for delivery.

Should coffee arrive in a damaged condition Buyers are to take the dam-
aged portion at actual graded allowance for the damage.

Coffee must be actually delivered to within five (5%) per cent more or less
of the quantity sold, Seller having the privilege of delivering "spot" coffee
in accordance with contract, grade or description in place of non-shipments
to fulfill contracts, and Buyer the same privilege. This variation in quantity
only to be permitted where coffee is sold on a specified plantation brand, but
exact quantities specified in the contract must be delivered if sold on descrip-
tion, known standard or type.

This contract is not contingent upon any other and is to be settled between
Buyer and Seller herein mentioned without reference to other contracts cover-
ing the same parcel.

No arrival, no sale, in case of coffees actually shipped but lost in transit.
Sold subject to delays caused by wars, revolutions, strikes, pestilences, floods
or other unavoidable interruptions, of transportation or cable communication
but should any of the above causes be of more than six (6) months duration
from the time shipment should be effected, contract void to the same extent.

Decision of quality and conditions is to be determined by C. E. Bickford & Co., and their decision is binding and final upon both Buyer and Seller.

Delivery Ex Dock, San Francisco, Cal.

On Contract No. X 943, 400 bags of coffee were undelivered at the time inventory was taken at the close of 1919.

Contract No. X 195 was dated November 12, 1919, and provided for the delivery of 1,000 bags of Robusta coffee at 20⅜ cents per pound, f. o. b. San Francisco. No delivery of such coffee had been made at the time inventory was taken at the close of 1919.

Contract No. X 928 was dated November 3, 1919, and provided for delivery of 1,000 bags of Robusta coffee at 20 cents per pound, f. o. b. San Francisco. No delivery of such coffee had been made at the time inventory was taken at the close of 1919.

Contract No. X 950 was dated November 14, 1919, and provided for the delivery of 200 bags of Robusta coffee at 20 cents per pound, f. o. b. San Francisco, " coffee to be shipped from Orient by steamer or steamers to San Francisco during November/December, 1919." No delivery of this coffee had been made when the inventory was taken at the close of 1919.

Each of these contracts was made with a different seller. In trade usage a bag of Robusta coffee is approximately 133 pounds. On December 31, 1919, there remained undelivered 345,800 pounds of said coffee, the contract price of which was $69,991.25, and the market price of which was $60,515. All of such coffee was delivered to the taxpayer in San Francisco during the early part of January, 1920. Only one grade of such coffee entered the Port of San Francisco because of the Pure Food Laws of the United States. The coffee referred to in the contracts complied with such laws.

On July 1, 1920, taxpayer entered into a contract with the California Packing Corporation for the purchase of canned fruits of various kinds, which contract was as follows, the description of the goods being omitted:

[Face of contract.]

CONTRACT OF SALE.

Canned Goods Department, California Packing Corporation.

Date, 7/1/20. Confirming Buyers Memo of_____

Sold to Haas Brothers, Buyer_____

Address San Francisco, Calif_____

Destination of Car_____

Routing_____

Broker: Direct_____

Broker's Address_____

Terms: Regular contract.  F. O. B., SF_____

Remarks:  1920  Pack_____ _____ _____

Terms and conditions on reverse side.

[Description of goods omitted.]

[Back of contract.]

CALIFORNIA CANNED FOODS CONTRACT.

Effective April 1, 1918.

Recommended by Canners' League of California (as per specifications on reverse side).

Terms: F. O. B. Pacific Coast rail shipping point cash less one and one-half per cent (1½%), if draft, with documents attached, payable in New York, Chicago or San Francisco exchange, is paid within ten (10) days from date thereof, otherwise net cash in thirty (30) days, unless shipment arrives prior thereto, in which case payment without discount shall be made within three (3) full business days thereafter. Documents against payment.

Local freight and transfer charges from interior points to point of shipment to be paid by buyer. All local freight, cartage and handling charges for assembling purposes incurred on less than carload lots to be paid by buyer.

Marine insurance: On shipments via all water route to Atlantic Coast or Gulf Ports, seller to insure for buyer's account and expense to cover buyer's cost with ten per cent (10%) added; English form of policy with three per cent (3%) particular average on each package. In seller's discretion, or at buyer's request, seller to place war risk insurance for account of buyer.

Conditions: On account of shipment from different factories, seller reserves the routing of freight. Notwithstanding shipped to seller's order, goods are at risk of buyer from and after delivery to carrier, and buyer hereby assumes all responsibility for shortage, loss, delay, or damage in transit upon issuance to seller by carrier of clean bill of lading or shipping receipt.

It is specifically agreed that any route herein specified shall be subject to its being open or available at time of shipment. If after notice by seller, where seller elects to give such notice, buyer does not desire to have shipment made by some route then open or available, or if no route is open or available, at time shipment is ordered, seller may store and insure goods for buyer's account. If so stored and insured, buyer agrees to pay draft with documents, less one and one-half per cent (1½%) in New York, Chicago or San Francisco exchange within ten (10) days from date of draft. If, upon arrival in San Francisco or other coast common point, pineapple cannot be shipped by any route for any reason or reasons set forth herein, seller shall store and insure goods for buyer's account and expense, and buyer agrees to pay for said goods, draft with documents, in accordance with the terms herein specified.

In case of short pack or Government commandeer, requisition or reservation, by reason of which seller is unable to make full delivery of any of the goods specified, delivery shall be prorated.

If seller shall be unable to perform any or all of its obligations by reason of strike, flood, fire, crop damage, failure of transportation facilities, or for any cause or condition beyond seller's control, such obligation shall at once terminate and cease.

Goods to be shipped in seller's discretion as soon as practicable after packing. If seller elects to ship in cars for several buyers any difference in freight on account of such shipments to be paid by seller. If seller shall elect to withhold shipment at buyer's request, then the goods unshipped shall

be billed and paid for on the following dates, respectively, hereinafter specified:

Peas—July 1st.
Asparagus—August 1st.
Tomatoes or tomato products—November 1st.
Fruits, fruit products or sundry vegetables—December 31st.
Hawaiian pineapple—December 31st.

Conditions on unshipped goods: Buyer agrees to pay for unshipped goods in ten (10) days from date of draft, net cash, with warehouse or storage receipt attached; and seller agrees to store said goods and to insure them in selected insurance companies for buyer's account against loss, or damage, by fire, for seventy-five per cent (75%) of the invoice value. Buyer shall pay one and one-quarter cents (1¼¢) per case per month to cover cost of both storage and insurance, fractions of month at full monthly rate, and charges shall accrue from date of warehouse or storage receipt to date of shipment. Seller shall have the right to move and store said goods at buyer's expense in public warehouse if goods are not ordered out by buyer prior to March 1st following date of billing as above. Local taxes, assessed the first Monday in March of each year, shall be for buyer's account.

Seller reserves the right to ship goods unlabeled when delay in receiving buyer's labels holds back shipment.

Swells: The goods covered by this contract are guaranteed by seller against swells until July 1st following the date billed, unless said swells arise from improper handling or storage by carrier or buyer. All claims for swells must be made and bills rendered by buyer on or before said July 1st and swells held subject to seller's order.

Claims other than for swells must be presented within ten (10) days from receipt of goods.

Guarantee: Seller guarantees goods covered by this contract to conform to the requirements of the National Food and Drug Act of June 30, 1906, as amended, except that seller shall be relieved of any liability for misbranding when goods are not shipped under seller's labels and/or brands.

This contract shall not be binding upon seller until signed by California Packing Corporation at its principal office in San Francisco. Brokers and salesmen have no authority to waive, change, or add to, any of the terms or conditions specified herein.

Buyer: Haas Brothers,
By: A. Meertief.
Seller: California Packing Corporation,
By: R. M. Barthold.

There are four other such contracts, which are identical in terms, except as to the description of the goods and the prices. At the time these contracts were entered into the fruits were not in actual existence, but were to be delivered to the taxpayer or its order during the autumn of 1920. On December 31, 1920, a part of such canned goods remained undelivered. The market price of such undelivered goods on December 31, 1919, was $7,589.53 less than the contract price.

On December 31, 1920, the California Packing Corporation had on hand a sufficient quantity of the goods covered by such contract to fulfill such contract and all other contracts for such goods out-

standing on that date. Such canned fruits were in the warehouses of the California Packing Corporation, arranged in stacks, fruits of the different grades, quantities, and values being kept in separate stacks with no commingling of various quantities or grades in any one stack. The goods called for by taxpayer's contract, and undelivered on December 31, 1920, had not been separated from other goods of like quantity, grade, and value. The Packing Company charged the taxpayer for storage and insurance on the balance of undelivered goods for the month of December, 1920, which charge was paid by the taxpayer in January, 1921.

On May 18, 1920, taxpayer entered into contracts with the California Prune & Apricot Growers, Inc., for the purchase of prunes in carload lots. These contracts are nine in number, are on printed forms of the broker, and are identical in terms, except as to the time of shipment of the goods, which varies from September to November, 1920. The contracts are numbered 12,674 to 12,682, inclusive, and are as follows:

[Face of contract.]

CALIFORNIA PRUNE AND APRICOT GROWERS, INC.

California Dried Fruit Contract.

SAN JOSE, CALIF., *May 18th, 1920.*

Haas Bros. of San Francisco, Calif., hereinafter called buyer, has this day bought, and California Prune and Apricot Growers, Inc., of San Jose, California, hereinafter called seller, has this day sold the following quantities of California Dried Fruits, as per varieties, style of package, and price named below, and in accordance with the terms and conditions set forth on this contract.

Destination: San Francisco, Calif.,

Routing: Delivery routing may be given later.

Consigned to: Order of Seller.

Time of Shipment: October–November. S. O.

1920 Crop.

One car Load Prunes Sunsweet Brand Assortment as follows:

        110/25 lbs. Boxes 30/40
        440/25  "      "    40/50
        550/25  "      "    50/60
        220/25  "      "    60/70
        330/25  "      "    70/80
        330/25  "      "    80/90
        220/25  "      "    90/100

Firm at Seller's opening prices, said prices guaranteed against Seller's own decline until January 1st, 1921.

1920 Boxing Charges.

Boxing specifications may be changed by buyer provided such changes are received at this office prior to September 1st, 1920.

Seller reserves the right to substitute a larger percentage of 30/40s to 70/80s for the smaller sizes.

This contract null and void if not signed and received at this office on or before twenty days from date.

J. & I. BLUM, INC., *Broker.*

[Back of contract.]

DRIED FRUIT CONTRACT.

(As per specifications on reverse side.)

Terms: F. O. B. Pacific Coast Rail Shipping Point. Cash less two percent (2%) if draft is paid within ten (10) days from date thereof, otherwise net cash thirty (30) days after date of draft, unless shipment arrives prior thereto in which case payment shall be made within three (3) full business days after arrival. Payment to be made against draft with documents attached in New York, Chicago or San Francisco Exchange, or equivalent.

Examination and approval: Buyer shall have no right of claim nor be entitled to arbitration and contract shall be considered fully complied with on Seller's part unless claim is made or arbitration demanded within three (3) full business days after arrival of goods or if examination is impossible within that time by reason of goods not being accessible for examination, then within said period after examination becomes possible.

Routing: Seller shall, where possible, recognize routing named by Buyer, but Seller has option of selecting the initial line. Should Buyer divert goods while in transit without Seller's consent, Seller shall be relieved of all responsibility for quality and/or condition. Change in routing from rail to water shipment (if requested) is subject to Seller's confirmation, Buyer assuming freight to and charges at Dock, State Toll, and all unloading and/or loading charges at Port. On such water shipments and on shipments to be made via Gulf Lines, the provisions of this contract shall be modified and superseded by the terms and conditions contained in the form of contract of the Seller, effective June 2nd, 1919, known as Dried Fruit Association of California Water Shipment Contract; but if at any time within ten (10) days prior to final shipping date it be found impossible by reason of blockade or embargo to ship via Gulf Lines, Seller shall notify Buyer and in the absence of immediate instructions to ship via another route then open or to store goods for Buyer's account, the Seller shall be privileged to ship by any rail route at current freight rates; should it be found impossible by reason of aforesaid causes to ship all rail, Seller shall then be privileged to store and insure at Buyer's expense. If goods are shipped all rail the terms and conditions of this contract shall apply; if stored Buyer agrees to pay Seller's draft at two (2) days' sight, less two percent (2%) discount, to which shall be attached (in addition to the weight and quality certificates provided by said Water Shipment Contract) Warehouse receipt and Fire Insurance Certificate.

Responsibility: Notwithstanding shipped to Seller's order, goods are at risk of Buyer from and after delivery to Carrier, and Buyer hereby assumes responsibility as to shortage, loss, delay or damage in transit upon issuance by Carrier of clean Bill of Lading or shipping receipt. Goods are at Buyer's risk when delivered at his request to a third party.

Quality: Good merchantable, unless otherwise specified, and equal to or better than the average of the grade for the section where grown and of the current season at time of shipment. If sold on sample to be equal to or better than sample.

Separable lots: This contract shall be deemed separable as to all goods sold hereunder and Buyer may not refuse to receive any lot or portion of the goods shipped hereunder for failure of any other lot or portion to comply with the contract, unless the right to so refuse is expressly provided for on the reverse side hereof.

Weights: No allowance shall be made except for shortage of average weights in excess of one percent (1%) to be ascertained and certified by public weigher upon a weighing for gross of not less than fifty percent (50%) and for tare of not less than two percent (2%) of the shipment. Carton goods—No. 16 to average fifteen (15) ounces net and No. 12, eleven (11) ounces net when packed. All other package goods to conform to established trade custom.

Specifications: If no assortment is agreed upon at time of sale it is expressly understood that sale is made subject to Seller's approval of a reasonable assortment specified by Buyer, based on Season's crop; unless such assortment is reasonable and is specified by Buyer at least thirty (30) days prior to the last day of shipping period, Buyer agrees to accept Seller's assortment according to Seller's grading, and unless specifications for packing are furnished prior to said thirty (30) days Seller may ship goods in any standard size packages.

Liability: If the operations of the Seller shall be prevented or interfered with by exercise of Governmental authority, or by force majeure, embargo, war, civil uprising, fire, strikes, or similar casualty beyond reasonable control of Seller, the Seller shall be excused from performance hereof to the extent that performance of this contract (taking into account all outstanding contracts of the Seller for the delivery of the same class of goods) shall be so prevented or interfered with. Extension of time: Should Seller be obstructed or delayed in the fulfillment of any portion of this contract by any of the aforementioned causes, or the failure of transportation facilities, then the time herein fixed for its fulfillment shall be extended for a period equivalent to the time lost for any or all of the reasons aforesaid, provided notice of such obstruction or delay is given before expiration of period herein fixed for shipment, and provided further that any premium for stipulated shipment be waived by Seller. It is agreed that if by reason of any of the aforementioned causes shipment of any of said goods is not made within sixty (60) days after the time herein specified therefor, this contract shall terminate with respect to any goods not then shipped. Future sales: In the event of destruction of or serious damage to crops after April 15th of the year in which this sale is made and subsequent to the date of this contract, Seller may reduce quantity twenty-five (25%) percent without penalty. If less than seventy-five (75%) percent is tendered, Seller shall pay as damages fifteen (15%) percent of net contract price of shortage below seventy-five (75%) percent unless the California State Commission of Horticulture shall decide the Seller is justified in delivering a smaller percentage because of crop damage. Unless a particular district is specified, the crop of the entire State of the variety of fruit named is to be taken into consideration in determining what is a fair delivery.

Pool cars: Distribution charges at destination at expense of Buyer. Where goods are sold in less than carload quantities to be included in car for various Buyers to be completed later, and said car is not completed within ten (10) days of expiration of contract time for shipment, Seller may ship goods in car to some point nearby to destination and the Buyer shall then pay local freight from such point to final destination.

Arbitration: Except for the determination to be made by the California State Commission of Horticulture as provided for under sub-heading " Future Sales," of liability clause, any dispute arising under this contract shall be immediately submitted to arbitration in either New York, Chicago, San Francisco, Baltimore, Boston, Buffalo, Cincinnati, Cleveland, Denver, Detroit, Indianapolis, Kansas City, Minneapolis, New Orleans, Oklahoma City, Omaha, Peoria, Philadelphia, Pittsburgh, Richmond, St. Louis, Seattle, St. Paul, or Toledo. The particular City in which arbitration is to be held shall, in the

absence of agreement by the parties, be in the city which is nearest to destination of shipment. Arbitrations in New York shall be held before the Dried Fruit Association of New York; in Chicago, before the Dried and Canned Foods Association; in San Francisco, before the Dried Fruit Association of California; in the remaining cities, by the joint arbitration boards appointed by the National Wholesale Grocers Association and the National Canned Goods and Dried Fruit Brokers' Association. A written statement of facts and anything else that may have proper bearing on the case, together with written argument thereon, may be presented to the Secretary of the Association or the Chairman of the Arbitration Board, as the case may be, and shall by him be submitted in its entirety to the arbitrators, but no oral presentation shall be made unless the parties agree thereto and same is permitted or requested by the arbitrators. If the decision is in favor of Seller, invoice, if unpaid shall become due and payable at once. If decision is against Seller arbitrators shall determine amount of allowance which, if draft has been paid, shall be immediately refunded by Seller and if draft has not been paid, shall be deducted from invoice and the correct amount paid immediately. If arbitrators find bad faith or gross carelessness on the part of Seller they may either allow rejection, award damages therefor or require another tender in compliance with this contract. Arbitration shall be held upon not less than one (1%) percent unbroken and unopened packages. The arbitrators shall assess costs of arbitration and the decision shall be final and binding on both parties who hereby agree to comply therewith. Failure of Seller to ship or Buyer to accept shall be considered a dispute to be settled by arbitration. Each party hereby agrees that in the event of his failure to comply with the award of the arbitrators within ten (10) days of date of such award, an action in court shall lie against him, based upon such award.

No unimportant variation in the performance of this contract shall constitute basis for a claim.

Brokers or salesmen not authorized to sign this contract nor change terms or wording without written authorization by Seller.

This contract not assignable without written consent of Seller.

Buyer: HAAS BROS.

By: W. HUTSHIMER.

(Seller): CALIFORNIA PRUNE & APRICOT GROWERS, INC.

By: H. G. GOYKENDALL.

The seller's opening prices, referred to in the contract, were fixed on August 11, 1920, as follows:

SUNSWEET BRAND.

| | |
|---|---|
| 20/30 | 25¢ flat per pound bulk (Boxing to be added). |
| 30/40 | 17¢ Bulk basis. |
| 40/50 | 15-1/2¢ Bulk basis. |
| 50/60 | 13¢ Bulk basis. |
| 60/70 | 11-1/2¢ Bulk basis. |
| 70/80 | 10-1/2¢ Bulk basis. |
| 80/90 | 9-1/2¢ Bulk basis. |
| 90/100 | 9-1/2¢ Bulk basis. |

First half September shipment, one-half cent premium.
Last half September shipment, one-quarter cent premium.

On December 31, 1920, 452,500 pounds of such prunes remained undelivered. The market price on December 31, 1920, of such undelivered prunes was $23,825.85 less than the contract price.

The California Prune & Apricot Growers, Inc., is a cooperative association of 11,000 producers of these fruits, organized as a corporation under the laws of California. Under the contracts entered into between the corporation and the growers, the corporation agrees to purchase and the grower agrees to sell all of the crops of prunes to be produced on the grower's lands during certain years named, the association agrees to use its best efforts to resell said fruits, and the grower shares in the profits obtained from the sale of his prunes and the prunes of other members of the association. The contract provides for the intermingling of the fruits produced by various growers. At the time the contracts were entered into the prunes had not ripened or been delivered by the growers to the corporation. Such delivery was made to the corporation in September and October, and at all times after October 31, 1920, the California Prune & Apricot Growers, Inc., had on hand sufficient prunes to fill its contract with the taxpayer and all other contracts. On October 27, 1920, the corporation telegraphed taxpayer stating "We must have authority from you to delay shipment on the balance at once or we will have shipped the other three cars to you at San Francisco immediately." On December 15, 1920, the association telegraphed its San Francisco agents stating that if shipping instructions were not received immediately they would draw on sixty-day trade acceptances with warehouse receipts, this telegram being communicated immediately to the taxpayer. On December 22, 1920, the association wrote taxpayer as follows:

We are under quite a big expense in carrying all of our prunes, and like everybody else, in need of money to pay our growers. If you can see your way clear to ship, say two cars of your prunes this month, we can carry the balance for another thirty days * * *. We would appreciate an order for at least two cars to be shipped out this month.

On October 28, 1920, taxpayer and the association had entered into an agreement, reading in part as follows:

In consideration of the Seller agreeing to use its best efforts in deferring shipments until November 30th, 1920, the Buyer hereby agrees that the time of shipment under Contract No. 14976–9–80–12673–4–5–6–7–8–9–80–81 & 82 may be extended to include November, 1920; and that the Buyer will accept delivery of all fruits so shipped up to and including the month of November, 1920, and will pay for the same in accordance with the terms of said contract at the opening prices of California Prune & Apricot Growers, Inc., and any other prices specified on said contracts.

On February 25, 1921, 412,500 pounds of such prunes remained undelivered and on that date a settlement was reached releasing

taxpayer from taking such prunes in consideration of a payment by taxpayer of $22,000.

In November, 1920, taxpayer entered into two contracts with the California Associated Raisin Co. for the purchase of 7,200 25-pound cases of the 1920 crop of Thompson seedless raisins, the contracts being in form as follows:

CALIFORNIA DRIED FRUIT CONTRACT.

California Associated Raisin Co., Fresno, Cal.

*November 9, 1920.*

Haas Bros. of San Francisco, hereinafter called buyer, has bought, and California Associated Raisin Co., of Fresno, California, hereinafter called seller, has this day sold the following quantities of California Dried Fruits, as per varieties, style of package, and price named below, and on terms and conditions stated on reverse side of this contract.

Destination: San Francisco.

Notify: Haas Bros.

Time of Shipment: June—buyer has option of shipping earlier.

| No. Cases | Size | Grade and Variety | Crop | Brand | Price |
|---|---|---|---|---|---|
| 5000 | 25-lb. | Recleaned Thompsons (Unbleached) | 1920 | Sun-Maid | 21¢ lb. |

These raisins for shipment to San Francisco Fob common shipping point California.

⅜¢ per lb added over selling price for carrying charges from March to June.

⅛¢ carrying charge if shipped January, February no charge for November–December shipments.

(Seller) CALIFORNIA ASSOCIATED RAISIN Co.

By: E. H. BROWER.

(Buyer) HAAS BROS.

This contract covered by Broker's letter of 11/9.

Broker: O'MALLEY COLLINS Co.

[The terms and conditions on the reverse side of this contract are identical with the terms and conditions of the Prune Contract above referred to.]

On December 31, 1920, the entire 180,000 pounds of raisins remained undelivered. The market price on that date of the undelivered raisins was $34,200. The contract price was $37,800.

In taking its inventories for 1919 taxpayer did not include such undelivered coffee. In taking its inventories for 1920 taxpayer did not include such undelivered canned goods, prunes, and raisins.

No debit was made to merchandise for any goods undelivered, nor was there a credit to notes, accounts, or bills payable. It did make upon its books entries setting up as losses the difference between the contract price of such undelivered goods and the market price on December 31 of the respective years. It claimed such losses upon its income-tax returns for such years. The amounts so claimed were disallowed by the Commissioner in computing the deficiency involved in this appeal.

The determination of the Commissioner is approved.

PHILLIPS: During the year 1919 taxpayer entered into contracts for the purchase of coffee. On December 31, 1919, a portion of each of these contracts remained undelivered. The market price of the coffee at that time was less than the cost and taxpayer set up on its books as a loss, and deducted in its income-tax returns as a loss, the difference between the contract price and the market price on December 31, 1919. In 1920 taxpayer entered into contracts for the purchase of canned goods, prunes, and raisins, a portion of each of which was undelivered on December 31, 1920, and similar entries were made on its books and claimed in its tax return for that year.

Taxpayer claims that title to such goods had passed to it on December 31 of the respective years; that such goods should, therefore, have been included in its closing inventories for such years at the market price, which was lower than cost, and the contract price should have been set up as an account payable. It is taxpayer's contention that the entries made upon its books accomplished the same results.

Section 203 of the Revenue Act of 1918 provides:

That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Pursuant to such provision of law the Commissioner adopted regulations providing for the valuation of inventories at (a) cost, or (b) cost or market, whichever is lower. The taxpayer valued its inventories upon the second basis. The Commissioner further provided in his regulations (Regulations 45, art. 1581, as amended March 3, 1922, by T. D. 3296):

A purchaser should include in inventory merchandise purchased, title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery transfer of title to which had not yet been effected.

Assuming, as we shall, that such regulations are reasonable and within the scope of the authority vested in the Commissioner, the sole question for determination in this appeal is whether title to the property covered by the contracts had passed to the taxpayer on

December 31 of the respective years. Each of the contracts was closed in California and is governed by the laws of that State.

Section 1140 of the California Civil Code provides:

TRANSFER OF TITLE UNDER SALE: The title to personal property, sold or exchanged, passes to the buyer whenever the parties agree upon a present transfer, and the thing itself is identified, whether it is separated from other things or not.

This section has been the subject of interpretation by the California courts in several cases. In *Hamilton* v. *Klinke*, 42 Cal. App. 426, 183 Pac. 675, and in *Jones* v. *California Growers & Shippers, Inc.*, 182 Cal. 777, 190 Pac. 172, it was held that contracts of sale of crops growing or to be grown upon certain identified property passed title to the purchaser. In *Blackwood* v. *Cutting Packing Co.*, 76 Cal. 212, 18 Pac. 248, however, a somewhat different situation existed and a different result was reached. In that case the agreement between the parties was witnessed by an instrument signed by the defendant reading:

Sold Cutting Packing Company my crop of apricots, at Haywards, for the seasons of 1882-83-84-85-86, not less than 75 tons, and not exceeding 200 tons, per annum, at 3 cents per pound, f. o. b. Haywards.

The only question before the court was whether or not title had passed prior to delivery of the crop. The court, in the course of its opinion, says:

The portion of the crop to be delivered had not been identified. What was contracted for was to be "not less than 75 tons, and not exceeding 200 tons per annum." Possibly it might be argued that, if any crop should turn out to be less than 75 tons, the buyer would not be bound to accept any portion of it. It is not necessary to consider that question. It certainly cannot be maintained that the same result would follow if the crop of any year should turn out to be more than 200 tons. At the time of the formation of the contract (to which the inquiry must relate) it could not be known what number of tons would be produced.

After quoting section 1140 of the Civil Code, the court goes on to say:

This section does not dispense with identification. On the contrary, it requires it. It only dispenses with segregation when the property is otherwise identified. Therefore, where the identification consists in the segregation, weighing or measuring, they are still necessary. And the present case was of the latter character. As against these controlling features of the transaction, the plaintiff has only the language of the instrument. The term "sold," it is said, indicates a consummated sale. But this word is not conclusive.

The court holds that in the case before it there was only a contract to sell and not a sale.

It is a recognized principle of law that no title passes unless the goods which are the subject of the sale have been identified either as the specific goods sold or as part of a specified mass of like goods.

The section of the Civil Code upon which taxpayer relies requires identification of the thing sold, although it does not require separation from other things. The rule is laid down in 35 Cyc. 291, as follows:

The subject-matter of the sale may be goods or articles which, although in existence at the date of the contract, have not been identified as the particular goods sold. In such case the contract is executory and the property in the goods does not pass until the goods have been identified and appropriated to the contract.

And in 35 Cyc. 295, the statement is made:

The contract of sale may relate to goods of a particular description but not part of a specific mass, as when goods are ordered from a dealer. Under such contracts the property in the goods does not pass to the buyer until there has been appropriation of specific goods to the contract.

Substantially the same rule is laid down in 24 R. C. L. 23, section 285.

In the case of the coffee contracts entered into by the taxpayer in November, 1919, it appears that these contracts were made with four different sellers and provided for the delivery of coffee to be shipped from source by steamer or steamers to San Francisco during November or December, 1919. The only description of the coffee sold was by grade. It is not described as coffee in a particular warehouse or on a particular steamer. When the coffee which was delivered in January, 1920, was shipped, it was not consigned to the taxpayer, but to the respective sellers, and there is nothing in the testimony to show that there was, prior to December 31, 1919, any appropriation of any particular coffee, or of a portion of any particular shipment, to the fulfillment of taxpayer's contract. It is conceivable, and indeed quite probable, that at least one of the sellers may at that date have had two or more shipments on the high seas bound for San Francisco, from either of which he could have fulfilled his obligations to the taxpayer. Until there was some identification of the coffee covered by such contracts, which would enable taxpayer to claim it as its property, no title could pass.

With respect to the contract for the purchase of prunes, taxpayer claims there was a present sale of growing crops. The California Prune & Apricot Growers, Inc., with which the contract was made, was a cooperative organization having contracts with 11,000 growers for their crops of prunes. Under the doctrine laid down by the California courts in *Hamilton* v. *Klinke* and *Jones* v. *California Growers & Shippers, Inc., supra,* it would seem to follow that title to such crops had passed to the California Prune & Apricot Growers, Inc., at the time of its contract with taxpayer. Taxpayer's contract, however, did not call for the prunes to be raised on any designated land or for any portion thereof. The seller was at liberty to

fulfill the contract with prunes grown upon any or all of the 11,000 ranches. It seems clear that, at the time the contract was made, at least, no title passed to the taxpayer. *Blackwood* v. *Cutting Packing Co., supra.* Nor do we believe that title passed·when the prunes came into the hands of the seller, for there does not appear at any time to have been any identification of taxpayer's goods, either as a separate mass or as a part of any designated mass. It is true that different qualities and sizes were separated into different bins in the warehouse of the seller and that the seller had on hand on December 31, 1920, sufficient prunes to fill all its contracts. Such prunes, however, were stored in the various warehouses of the seller and delivery might have been made from any of these various warehouses. Assume, for example, that one of the warehouses had been destroyed. Would it have been possible for either the taxpayer or the California Prune & Apricot Growers, Inc., to have successfully contended that the prunes destroyed by fire were the property ₒf the taxpayer or that a certain percentage of them belonged to the taxpayer? In the absence of any sufficient identification, it can not be said that title has passed.

The same situation existed with reference to the canned goods purchased under the contracts with the California Packing Corporation and remaining undelivered on December 31, 1920. It further appears that the seller required taxpayer to pay storage and insurance on the canned goods after December 1, 1920. There is nothing, however, to show that the California Packing Corporation at any time actually set aside the goods to be delivered to the taxpayer or even designated the place at which these goods were stored. The storage and insurance charges appear to be in the nature of damages imposed upon the taxpayer for its failure to take the goods in accordance with its contracts. There is an absence of any proof that the insurance charged to the taxpayer was placed with the insurance companies upon any particular goods, or upon a portion of any particular goods.

So far as the raisin contracts are concerned, it is sufficient to say that the only proof was that the contract was made, that the raisins were not delivered, and that the market price on December 31, 1920, was less than the contract price. It does not appear that the California Associated Raisin Co. had on hand on December 31, 1920, sufficient raisins to fulfill the contract, but, even though we should assume that such was the case, there is an utter absence of any proof of identification of the properties sold, except by a description of the grade, variety, and crop to be delivered.

The loss claimed by the taxpayer can not be sustained on the ground that title passed. This being so, the entry made by the tax-

payer was no more than a reserve for anticipated losses, which this Board has decided can not be allowed as a deduction. *Appeal of Morrison-Ricker Mfg. Co.*, 2 B. T. A. 1008.